FIFTH DISTRICT COURT OF APPEAL
STATE OF FLORIDA

_____

Case No. 5D2024-0138
LT Case No. 22F-08060
_____

M.N., C/O P.N.,

    Appellant,

    v.

AGENCY FOR PERSONS WITH
DISABILITIES,

    Appellee.

_____


Administrative Appeal from the Agency for Persons with
Disabilities.

Marissa A. O'Conner, of Community Legal Services of Mid
Florida, Orlando, for Appellant.

Erin W. Duncan, of Agency for Persons with Disabilities,
Tallahassee, for Appellee.


October 4, 2024


BOATWRIGHT, J.


    M.N. appeals an administrative final order from the
Department of Children and Families, Office of Appeal Hearings,
which affirmed the Agency for Persons with Disability's (APD)
denial of M.N.'s eligibility for Home and Community Based

Services ("HCBS," or "services") under the criteria for "autism" as defined in section 393.063(5), Florida Statutes (2022). For the reasons set forth herein, we reverse.

## I.

M.N. was born on April 1, 2003. He was removed from his birth mother's custody via dependency proceedings which occurred in May of 2007. As a result, he was placed with foster parents who subsequently adopted in him in 2009. In November of 2007, M.N. was referred for a psychological evaluation by his foster mother, "P.N." P.N. had significant concerns that M.N. showed signs of developmental delays and was potentially autistic. M.N. was ultimately diagnosed with Autism Spectrum Disorder, Reactive Attachment Disorder, Attention Deficit Hyperactivity Disorder, and Neglect of Child.

In 2008, M.N. (through his parents) applied for a Medicaid waiver to obtain autism support services. This application was made to ADP, which is responsible for administering the Medicaid HCBS Waiver program for individuals with specific developmental disabilities (the "iBudget waiver program," or "waiver program"). The purpose of the waiver program is to meet the needs of those who prefer to receive long-term care services and support in their home or community, rather than in an institutional setting.

At the request of APD, a psychologist with Florida Psychological Specialists evaluated M.N. in May of 2008. Based on the evaluation, M.N. was found to have met the criteria for Autism Spectrum Disorder ("autism"). Following the evaluation, APD provided M.N. with support coordination due to the severity of his autism. The support coordination continued throughout 2013, when M.N. was moved off the waiver program wait list and enrolled in services.

M.N. remained enrolled on the waiver program until he and his family moved out of the state of Florida in 2015, at which time M.N. was removed from the waiver program due solely to the fact that he had moved out of the state. In November of 2021, M.N. and his parents moved back to Florida. Shortly thereafter, on January 3, 2022, M.N. completed an APD application for services due to his

autism. M.N. sought to re-enroll in the waiver program and requested services for an intermediate care facility (ICF), as he had been accepted to an ICF pending waiver approval.

During the time period that M.N. left the state and returned, he underwent regular psychological and mental health evaluations. Based on these evaluations, he continued to be diagnosed as suffering from autism. He was considered to have delays in motor, cognitive, social, and functional development. His communication, daily living, and socialization skills ranked in the bottom 1%. He had an IQ of 70. At the time he requested services for an ICF, he was self-injurious and his parents could no longer care for him without services.

In June of 2022, rather than allowing M.N. to return to the waiver program or adding him to the pre-enrollment category of clients requesting waiver participation, ADP outright denied his request for services. ADP's denial notice indicated that M.N.'s autism was not severe enough to meet the definition of autism under section 393.063(5). Notably, although M.N. received numerous evaluations during this time period, he was never considered to not have suffered from autism, a point which ADP readily admits on appeal. In fact, in its answer brief, ADP states, "There is no dispute that M.N.'s condition is such that he will likely need extensive care for the rest of his life." In addition, even though M.N. had previously been considered to have severe autism under section 393.063(5), APD changed its position and determined that M.N.'s autism did not meet the statutory definition. In July of 2022, M.N. requested an administrative hearing challenging APD's decision.

At the administrative hearing, M.N. argued that based on the current administrative rules—in particular, Florida Administrative Code Rule 65G–4.0215(7)(a)—and the principle of administrative finality, he should not have been required to re-establish the severity of his autism so as to meet the definition of autism under section 393.063(5). He contended that instead, once he re-established domicile within the state of Florida, he should either have been allowed to re-enroll and be returned to the waiver program or added to the pre-enrollment category of clients requesting waiver program participation. In the alternative, M.N.

3

asserted that even if he had been required to re-establish eligibility, the severity of his autism met the definition of autism under section 393.063(5).

ADP countered that based on its internal policy interpreting rule 65G–4.0215(7)(a), once M.N. disenrolled, he was required to renew his application for services and receive a new eligibility determination. Specifically, an ADP employee testified that pursuant to ADP's internal policies, when a waiver program client moves and later returns to the state, the client must submit a new application and be re-evaluated for eligibility. In addition, ADP argued that even though M.N. suffered from autism, he did not meet the level of severity required under 393.063(5), nor did he meet the criteria established under Florida Administrative Code Rule 65G–4.014 to establish eligibility for services through the waiver program.

The hearing officer agreed with ADP and upheld the agency's denial of benefits. In particular, the hearing officer, rather than interpreting rule 4.0215(7)(a) without giving deference to ADP's interpretation of the rule, found that based on "APD's policy, if a customer received services in the past, but was disenrolled from the waiver program for over 365 days, they must reapply and be reevaluated for eligibility." Further, the hearing officer found that although M.N. suffered from autism, he did not establish that his autism rose to the level of severity required under section 393.063(5) and rule 65G–4.014.

M.N. timely appeals the decision. On appeal, M.N. argues that APD's initial determination that he met the statutory definition of autism and his consequent enrollment in the waiver program constituted a final agency decision regarding the severity of his autism that should have been given administrative finality. As such, pursuant to rule 65G–4.0215(7)(a), ADP was required to place M.N. back on the waiver program's waiting list if it did not re-enroll him in services. Had APD followed this rule, it would have conducted an evaluation to determine whether M.N. was eligible for the crisis priority category, rather than re-determining his medical eligibility for the waiver program. In addition, M.N. argues that he produced sufficient evidence of the severity of his autism so as to satisfy the statutory requirements under section

4

393.063(5), and that ADP did not produce competent substantial evidence showing his autism was insufficient to satisfy the requirements of section 393.063(5). We agree with M.N. that the hearing officer misinterpreted rule 65G–4.0215(7)(a) and improperly deferred to APD's internal policies in requiring a new determination of M.N.'s eligibility. As a result, we do not discuss whether the hearing officer's findings were supported by competent substantial evidence, and our analysis is limited to the applicability of rule 65G–4.0215(7)(a).

## II.

Although appellate courts generally uphold administrative agency decisions if they are supported by competent substantial evidence, "'the same standards of review do not apply to an erroneous application of the law to the facts.'" *Jerry Ulm Dodge, Inc. v. Chrysler Grp. LLC*, 78 So. 3d 20, 23 (Fla. 1st DCA 2011) (quoting *Seneca v. Fla. Unemplmt. App. Comm'n*, 39 So. 3d 385, 387 (Fla. 1st DCA 2010)). Therefore, our review of an agency's conclusions of law is de novo. *Town of Miami Lakes v. Dep't of Mgmt. Servs.*, 368 So. 3d 499, 501 (Fla. 3d DCA 2023). In our review, we do not give deference to agency interpretations of statutes or rules. *Id.* As stated by Article V, Section 21 of the Florida Constitution: "In interpreting a state statute or rule, a state court or an officer hearing an administrative action pursuant to general law may not defer to an administrative agency's interpretation of such statute or rule and must instead interpret such statute or rule de novo." *See also MB Doral, LLC v. Dep't of Bus. & Pro. Reg., Div. of Alcoholic Beverages & Tobacco*, 295 So. 3d 850, 853 (Fla. 1st DCA 2020) (noting that "[w]ith the passage of article V, section 21 of the Florida Constitution, the previously afforded deference to the agency's interpretation of the statutes it implements has been abolished; our review is de novo.")); *G.R. v. Ag. for Pers. with Disab.*, 315 So. 3d 107, 108 (Fla. 3d DCA 2020).

In interpreting rules of an administrative agency, the words in the text should be given their plain and ordinary meaning. *Boca Raton Artificial Kidney Ctr. v. Dep't of HRS,* 493 So. 2d 1055, 1058 (Fla. 1st DCA 1986); *see also Accardi v. Dep't of Env't Prot.*, 824 So. 2d 992, 995 (Fla. 4th DCA 2002) (determining that when interpreting the Florida Administrative Code, the words in the

rules should be given their plain and ordinary meaning). In determining the plainness or ambiguity of a legal text, whether in a statute or an administrative rule, Florida courts have recognized the "supremacy-of-text principle," which means that "[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." *Fla. Farm Bureau Gen. Ins. Co. v. Worrell*, 359 So. 3d 890, 892 (Fla. 5th DCA 2023) (holding that the supremacy of the text principle applies to contractual language as well as state statutes) (citing *Ham v. Portfolio Recovery Assocs., LLC,* 308 So. 3d 942, 946–47 (Fla. 2020))). "[T]he plainness or ambiguity of [a legal text] is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* (citing *Conage v. United States,* 346 So. 3d 594, 598 (Fla. 2022)).

Florida courts also are guided by Justice Joseph Story's view that "every word employed in [a legal text] is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it." *Advisory Op. to Governor re Implementation of Amend. 4, the Voting Restoration Amend.*, 288 So. 3d 1070, 1078 (Fla. 2020) (quoting Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 157–58 (1833)). Thus, the goal is to arrive at a "fair reading" of the text and apply the text to the given facts before the Court. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 33 (2012).

As such, a statute or an administrative agency's rule should be interpreted to give effect to every clause in it and to accord meaning and harmony to all of its parts. *Fla. Virtual Sch. v. K12, Inc.,* 148 So. 3d 97 (Fla. 2014). Thus, the court's function is to interpret the text of the rule or statute as it is written and give effect to each word in the rule. *Fla. Dept. of Rev. v. Fla. Mun. Power Agency*, 789 So. 2d 320, 324 (Fla. 2001). These rules of construction apply to rule 65G–4.0215(7)(a).

According to rule 65G–4.0215(7)(a):

When a client is enrolled in the iBudget, that client remains enrolled in the Waiver position allocated

unless the client becomes disenrolled due to one of the following conditions:

1. The client or client's legal representative chooses to terminate participation in the Waiver.

2. The client moves out-of-state.

3. The client loses eligibility for Medicaid benefits and this loss is expected to extend for a lengthy period.

4. The client no longer needs Waiver services.

5. The client no longer meets level of care for admission to an ICF/IID.

6. The client no longer resides in a community-based setting but moves to a correctional facility, detention facility, defendant program, or nursing home or resides in a setting not otherwise permissible under Waiver requirements.

7. The client is no longer able to be maintained safely in the community.

If a client is disenrolled from the Waiver and becomes eligible for reenrollment within 365 days that client can return to the Waiver and resume receiving Waiver services. If Waiver eligibility cannot be re-established or if the client who has chosen to disenroll has exceeded this time period, the client cannot return to the Waiver until a new Waiver vacancy occurs and funding is available. In this instance, the client is added to the preenrollment category of clients requesting Waiver participation. The new effective date is the date eligibility is re-established or the client requests re-enrollment for Waiver participation.

Rule 65G–4.0215(7)(a) sets out seven ways in which a client may become disenrolled from the waiver program. The first two bases for disenrollment allow the client to make the decision to be

disenrolled from APD services. Fla. Admin. Code. R. 65G–4.0215(7)(a)(1)–(2). These two reasons do not involve any medical eligibility determination for disenrollment from services. Specifically, the second enumerated basis for disenrollment requires the client to be disenrolled from services if he/she moves out of the state. Fla. Admin. Code R. 65G–4.0215(7)(a)(2). By contrast, the remaining five bases for disenrollment are not based on the client's choice, but instead involve a loss of medical eligibility and/or a change in level of care. Fla. Admin. Code R. 65G–4.0215(7)(a)(3)–(7).

The rule additionally provides timing requirements once a client has been disenrolled. First, according to the flush language of the rule, "if a client is disenrolled from the Waiver and becomes eligible for reenrollment within 365 days that client can return to the Waiver and resume receiving Waiver services." Fla. Admin Code R. 65G–4.0215(7)(a). APD acknowledges that if a client can remove or rectify the reason for the disenrollment, the client is re-enrolled and added back to the waiver program. In this scenario, APD agrees that eligibility does not need to be re-established. However, APD contends that once 365 days have elapsed, re-eligibility must be established regardless of whether the client can rectify the reason for disenrollment.

When reading the provision as a whole, rule 65G–4.0215(7)(a) clearly distinguishes between the re-establishment of "waiver eligibility" and a "client who has chosen" to disenroll and then re-enroll. The choice of which criteria to use depends on the reason for disenrollment. When the client has made the choice to disenroll and later re-enroll (pursuant to either rule 65G–4.0215(7)(a)(1) or (2)) after 365 days, "the client is added to the pre-enrollment category of clients requesting Waiver participation" until a new vacancy occurs and funding is available. As the flush language provides: "[I]f the client who has chosen to disenroll has exceeded this time period, the client cannot return to the Waiver until a new Waiver vacancy occurs and funding is available." When this happens, the client is added to the pre-enrollment category of clients requesting participation. "The new effective date is the date…the client requests re-enrollment."

By contrast, when the client has been involuntarily removed from services (pursuant to Fla. Admin. Code R. 65G–4.0215(7)(a)(3)–(7)) and waiver eligibility cannot be reestablished (regardless of the length of the removal), "the client is added to the preenrollment category of clients requesting Waiver participation" until a vacancy occurs, and funding is available. "The new effective date is the date eligibility is reestablished. . . ." Fla. Admin. Code R. 65G–4.0215(7)(a). In those circumstances, the client would have to re-establish eligibility.

Thus, we disagree with APD's interpretation of the rule. ADP would have us believe that, as to re-establishing eligibility, the distinction in the rule is solely based on whether the application for re-enrollment is submitted within 365 days of disenrollment. This makes little sense to us. For example, if a client became disenrolled because under rule 65G–4.02157(a)(3), the client "los[t] eligibility for Medicaid benefits," and the "loss was expected to extend for a lengthy period," a reasonable reading of the rule would be that the individual would have to re-establish entitlement to benefits regardless of when the application was re-submitted. The timing aspects of the rule do not dictate when a client must re-establish eligibility. Rather, the timing of the rule addresses whether a client can be returned directly back on the waiver program and immediately resume receiving services (within 365 days) or whether the client must be added to the pre-enrollment waiting list (outside of 365 days).

In this case, M.N. chose to disenroll by moving out of the state in accordance with rule 65G–4.0215(7)(a)(2). He had already been determined medically eligible for services and was disenrolled only because he was no longer domiciled in the state. APD admits in its brief that "there is no dispute that Appellant was disenrolled from APD Services and became ineligible due to his move out of the state." APD thus concedes that M.N. was never disenrolled due to medical ineligibility. Based on the language in the rule, once M.N. moved back into the state, his residence in the state automatically rectified the reason for the disenrollment. Because he moved back to Florida outside of the 365-day time frame provided in the rule, he would not have been placed automatically back on the waiver program but would instead have had to wait until a vacancy occurred. Thus, under the plain

9

language of the rule, M.N. should have been added to the preenrollment category of clients requesting Waiver participation.

Even if one considered APD's reading of rule 65G-4.0215(7)(a) to require M.N. to "reestablish eligibility," the plain language of the rule, when reading it as a whole, would require him to reestablish his domicile in Florida (as opposed to reestablishing his medical eligibility), as this was the basis for his disenrollment. This reasoning would follow with the principle of administrative finality which applies in this case. Administrative finality is the administrative law counterpart to res judicata. *Delray Med. Ctr., Inc. v. State, Ag. for Health Care Admin.*, 5 So. 3d 26, 29 (Fla. 4th DCA 2009). Administrative finality ensures that there is "a terminal point in every proceeding[,] both administrative and judicial, at which the parties and the public may rely on a decision as being final and dispositive of the rights and issues involved therein." *Austin Tupler Trucking, Inc. v. Hawkins*, 377 So. 2d 679, 681 (Fla. 1979). Florida courts generally do not apply the doctrine of administrative finality if there has been a significant change in circumstances or if there is a demonstrated public interest. *See Pumphrey v. Dep't of Child. and Fam.*, 292 So. 3d 1264 (Fla. 1st DCA 2020). A significant change in circumstances occurs when there has been a change in the facts or circumstances that led to the original agency decision. *See id.* at 1266 (holding that "[t]he proper rule in a case where a previous permit application has been denied is that res judicata will apply only if the second application is not supported by new facts, changed conditions, or additional submissions by the applicant").

In 2008, M.N. was diagnosed with severe autism by APD to the extent that support coordination services were provided. In 2013, M.N. was moved off the waiver program's wait list and enrolled in services. Thus, the severity of M.N.'s autism was previously decided, and this determination constituted a final agency decision. APD argues on appeal that M.N. was required to re-apply and have a new determination of medical eligibility solely because he moved out of the state. APD contends that because M.N. moved out of the state for the past seven years, there was a significant change in circumstances requiring him to re-establish his medical eligibility. APD does not argue on appeal that this was required because his medical condition improved. We find that

10

simply moving out of the state for an extended period of time does not constitute a significant change in circumstances such as would warrant a need for M.N. to re-establish the severity of his autism. To support this argument, APD would have needed to argue (both below and on appeal) that M.N.'s medical condition changed over this time period. APD has not argued on appeal that there was a change of any facts or circumstances as to M.N.'s original medical eligibility determination other than a change in location and time. As such, we do not find that a change in location and the passage of time alone justified requiring M.N. to re-establish his medical eligibility.[1]

## III.

We conclude that the hearing officer erred in deciding that M.N. needed to re-establish the severity of his autism in order to be put on the waiver program waiting list. Initially, the hearing officer erred by relying on APD's policies in making its decision and thus, in essence, impermissibly gave deference to APD's interpretation of rule 65G–4.0215(7)(a) in violation of Article V, Section 21 of the Florida Constitution. Further, the language of rule 65G–4.0215(7)(a) is inconsistent with APD's position and the hearing officer's ruling. We read rule 4.0215(7)(a) to provide that a person who is disenrolled solely due to moving out of the state pursuant to rule 65G–4.0215(7)(a)(2) is not required to reestablish medical eligibility for the waiver program upon moving back into the state, but is instead entitled to be re-enrolled in services (within 365 days) or placed on the preenrollment waiting list (outside of 365 days). Finally, based on the principle of administrative finality, there was no need for APD to disregard the

---

[1] This same reasoning is found in numerous Florida family law cases. For example, relocation out of state is not necessarily sufficient to constitute a substantial change of circumstances warranting modification of a time-sharing arrangement. *Ness v. Martinez*, 249 So. 3d 754, 757 (Fla. 1st DCA 2018). In modifying child custody arrangements, the mere passage of time is only considered a substantial change in circumstances when it is also coupled with significant changes that affect the well-being of the child. *Pederson v. Pederson*, 752 So. 2d 859 (Fla. 1st DCA 2020).

original decision of the severity of M.N.'s autism, as there was no significant change in circumstances that would have required him to re-establish his diagnosis.

Accordingly, we reverse the order on appeal and remand for further proceedings consistent with this opinion.

REVERSED and REMANDED for further proceedings.

HARRIS, J., concurs.
MACIVER, J., dissents without opinion.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____